545 So.2d 1285 (1989)
STATE of Louisiana, Appellee,
v.
James SHELTON, aka Jim, Appellant.
No. 20584-KA.
Court of Appeal of Louisiana, Second Circuit.
June 14, 1989.
*1287 Davenport, Files & Kelly by Lavalle B. Salomon, Monroe, for appellant.
William J. Guste, Jr., Atty. Gen., Baton Rouge, James A. Norris, Jr., Dist. Atty., and Robert S. Noel, II, Asst. Dist. Atty., Monroe, for appellee.
Before MARVIN and SEXTON, JJ., and JASPER E. JONES, J., Pro Tem.
MARVIN, Judge.
James Shelton appeals his conviction in a bench trial of molesting his four-year-old stepdaughter. He also complains that his four-year hard labor sentence is excessive. LRS 14:81.2.
Shelton's 11 assignments raise five issues which question the constitutionality of the statute, the admissibility of the victim's pre-trial videotaped statement, the sufficiency of the bill of information, the sufficiency of the evidence to convict, and excessiveness of sentence. We do not consider other assignments of error which were not briefed or argued. URCA, Rule 2-12.4; State v. Brown, 444 So.2d 1346 (La.App. 2d Cir.1984), writ denied.
We find no error and affirm.

FACTS
The child was born in December 1982. After her parents divorced in 1984 they amicably alternated her custody every six months. Shelton married the child's mother in 1985. The child's father has lived with the same woman for several years in a stable "common-law marriage" relationship. We shall refer to the father's companion as the child's stepmother.
In March 1987, while the child was living with her father and stepmother, the parents agreed the child would spend a week with her mother. Shelton picked her up on Saturday, March 14. The following Saturday her father picked her up at her mother's *1288 house, taking her to visit her paternal grandparents the next day.
During the two days and nights she was with her grandparents she urinated only twice, telling her grandmother that she could not go to the bathroom because "it hurt." She responded affirmatively when her grandmother asked her if anyone had ever touched her vagina, saying that "Jim had [done so] with his finger ... that it hurt and she had cried."
Both Shelton and the child's father are named James. The child calls her father "Daddy" and calls Shelton "Jim." The father was called Jimmy when he was younger but has used the name James for the past eight or ten years and has never been known as Jim.
When the child returned to her father's home on March 24, she told her stepmother that she could not urinate because "it hurt." Her stepmother, unaware that the child had made the same complaint to her grandmother over the past two days, noticed that the child's vagina was red and swollen. The stepmother had noticed this condition before when the child returned from visits with her mother and Shelton.
The stepmother contacted the child protection division of DHHR on March 25, 1987. Two days later, the child was examined by Dr. Meade O'Boyle, a pediatrician with special training and education in child sexual abuse. Dr. O'Boyle found that the child's hymen was not intact, her vagina was more open than normal for a child her age, and she had scars in several areas of her vaginal tissue, indicating that the tissue had been torn.
After the physical examination, and when the child was fully dressed, Dr. O'Boyle asked her what had happened to her. The child pointed to her vaginal area and said that Jim had touched her and hurt her "down there" with his fingers, his mouth and his "tallywhacker."
From her physical findings and the child's subsequent statements to her, Dr. O'Boyle opined that the child had been sexually abused, most likely through fondling. She found no evidence of acute trauma and explained that torn vaginal tissue can heal completely in one to two weeks.
On March 31, 1987, the child's mother contacted the DHHR caseworker and reported that abuse may have been inflicted by the child's father or by the stepmother's 13-year-old son, who also lived in the father's home. The child was placed in the custody of DHHR for about three weeks and was returned to her father's home after an investigation by DHHR determined that the home was safe for the child.
On April 20, 1987, a deputy sheriff in Ouachita Parish conducted a videotaped interview with the child in the presence of the DHHR caseworker. The child correctly identified the genitals and other body parts on anatomically correct dolls, using the word "gina" for vagina and "tallywhacker" for penis. When asked whether anyone every hurt her on her "gina," she said, "Jim hurt my gina ... hurt it and pinched it ... with his hands." When asked who Jim was, she said, "That lives with Rhonda [the child's mother]." She said no one else had hurt her "gina."
On cross-examination at trial, the child testified that "Jim hurt me, it was my vagina.... He sticked his finger in it." When asked if she saw Jim in the courtroom, the child pointed to Shelton.
Shelton testified at trial, denying he had touched the child's vagina. He and a friend who saw him with the child several hours after he picked her up from her father's house on March 14, 1987, testified that the child held herself as if she needed to go to the bathroom but repeatedly answered no when they asked her if she had to go to the bathroom. Shelton testified that the child had exhibited the same behavior at one time when she had a bladder infection. He said the child's vagina was red and chapped on March 14, 1987, and the child's mother rubbed some Desitin cream on it that night.
Shelton and the child's mother did not live together after September 1987. At trial, Shelton said he did not know where his wife was living.
*1289 Dr. Bonita Dyess, the child's pediatrician since birth, treated the child for a urinary tract infection in July 1985 and for vaginal yeast infections in February and March 1986. She last saw the child in October 1986, then referring the child to a specialist for treatment of chronic ear infections. Dr. Dyess's records showed no physical evidence, history, or reports of possible sexual abuse.

STATUTE
LRS 14:81.2 provides:
A. Molestation of a juvenile is the commission by anyone over the age of seventeen of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person, by the use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm, or by the use of influence by virtue of a position of control or supervision over the juvenile. Lack of knowledge of the juvenile's age shall not be a defense.
B. Whoever commits the crime of molestation of a juvenile shall be fined not more than five thousand dollars, or imprisoned, with or without hard labor, for not less than one nor more than ten years, or both.
C. Whoever commits the crime of molestation of a juvenile when the offender has control or supervision over the juvenile shall be fined not more than ten thousand dollars, or imprisoned, with or without hard labor, for not less than one nor more than fifteen years, or both.
Shelton challenges the constitutionality of the statute in two respects. Because the maximum penalty is 15 years if the offense is committed by someone who has control or supervision over the juvenile, and 10 years if the offender uses force, threats or intimidation, Shelton contends the legislature created two distinct crimes, thereby violating LSA-Const. Art. 3, § 15 by including both crimes in the Act [220 of 1984]. Alternatively, Shelton argues the statute is overbroad and confusing and fails to give adequate notice of what conduct is proscribed.
Art. 3, § 15(A) of the state constitution provides in part:

Every bill, except the general appropriation bill and bills for the enactment, rearrangement, codification, or revision of a system of laws, shall be confined to one object. Every bill shall contain a brief title indicative of its object.
Emphasis added.
The "single object" requirement of the constitution was summarized in State v. Cooper, 382 So.2d 963 (La.1980):
A legislator should not have to consider the validity of two unrelated objects in deciding how to vote on a bill. One act, therefore, cannot include incongruous and unrelated matters.
The Constitution does not prohibit the legislature from dealing with several branches of one subject or from providing in one act the necessary means for carrying out its object.
[Quoting from an earlier case] If all the parts of a Statute have a natural connection and reasonably relate, directly or indirectly, to one general and legitimate subject of legislation, the statute is not considered as being open to the objection of plurality, no matter how extensively it deals with the details looking to the accomplishment of the main legislative purpose.
382 So.2d at 965; citations omitted.
Cooper involved a first degree murder charge under the statutory scheme enacted in Act 74 of 1979. Cooper challenged the act as violating the "single object" requirement because it contained the substantive definition of first degree murder as well as procedural provisions for sentencing in all capital cases, not limited to first degree murder. After noting that first degree murder and treason were the only capital offenses remaining after capital punishment had been declared unconstitutional for aggravated kidnapping, the court found that the primary legislative intent was to *1290 provide capital sentencing considerations for first degree murder cases and that the substantive and procedural provisions of the act were not so unrelated as to render their joinder in violation of the "one object" constitutional provision.[1]
A violation of the single object requirement of an earlier constitution was found in State v. Peterman, 121 La. 620, 46 So. 672 (1908). The act in question defined two separate and distinct crimes: cutting or removing timber from another's land without his consent, and purchasing timber without obtaining the seller's affidavit that the timber was paid for. Because the "purchasing" crime was not limited to timber taken from the land of another without his consent, the court said it could not be considered as "in aid of the object set forth in the first section."
Single object challenges have not been successful where the legislative act contains either alternative methods of committing a particular crime or differing penalties for offenses graded according to the value of the property involved. See State v. Morgan, 238 La. 829, 116 So.2d 682 (1959); State v. Pete, 206 La. 1078, 20 So.2d 368, 372 (1944); State v. Craig, 158 La. 866, 104 So. 744 (1925); State v. Clark, 146 La. 421, 83 So. 696, 699 (1920).
The analysis should not be different where, as here, Shelton challenges the legislation because it includes both alternative methods of committing a crime and different penalties depending on the method used. The issue is whether the act deals with "incongruous and unrelated matters." State v. Cooper, supra.
Before the legislature enacted the molestation statute in 1984, LRS 14:81 proscribed lewd or lascivious conduct (indecent behavior) with or in the presence of a child under 17 by a person over 17 and at least two years older than the child, with the intention of arousing or gratifying the sexual desires of either person. The molestation statute, § 81.2, tracks the language of § 81 and adds an element not included in the definition of indecent behavior: commission of the offense either by use of force, threats or intimidation or by the use of influence resulting from a position of control or supervision over the juvenile.[2]
The 1984 legislation describes several ways in which an adult may coerce or influence a child to participate in or witness lewd conduct. The fact that there are alternative ways of committing the crime of molestation, with a corresponding difference in the maximum sentencing exposure, does not make the statutory provisions "so unrelated as to render their joinder in one act unconstitutional." State v. Cooper, supra.
Shelton also challenges the statute as constitutionally infirm because it fails to inform a defendant of the nature of the crime with which he is charged.
Under the state and federal constitutions, a criminal statute must give a person of ordinary intelligence fair notice of what conduct is forbidden, and must provide adequate standards for the factfinder to apply in determining the guilt or innocence of the accused. State v. Griffin, 495 So.2d 1306 (La.1986).
Shelton contends the statute is confusing because "each of the two offenses denounced has a separate element which the other does not have." We have explained that the statute defines one offense that may be committed in alternative ways (by use of force, etc. or by use of influence). We conclude the statute does not embody two separate offenses.
Shelton also argues that it is unclear from the statute whether a defendant convicted *1291 of molestation will be subject to the 10-year or the 15-year maximum penalty. Paragraph C of § 81.2 clearly provides that the 15-year maximum applies if the crime is committed "when the offender has control or supervision over the juvenile." Any other violation subjects the offender to the 10-year maximum under paragraph B.
We cannot agree that the statutory definition of the offense or the penalty scheme is confusing to a person of ordinary intelligence. See and compare State v. Holstead, 354 So.2d 493 (La.1977).
The statute is not unconstitutional.

BILL OF INFORMATION
Shelton contends the bill of information is fatally defective because it did not allege his age, an essential element of the offense, and it did not allow him to determine which of the two alternative types of proscribed conduct he was being charged with (use of force, etc. or use of influence).
The bill alleges that the defendant did willfully and unlawfully commit a lewd and lascivious act upon the person of H. Brooks, DOB 12/14/82, a child under the age of seventeen years, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either of the persons, said H. Brooks or James Shelton by the use of duress, menace, psychological intimidation or use of influence by virtue of James Shelton's position of control or supervision over the juvenile, contrary to the provisions of R.S. 14:81.2.
The bill must inform the accused of the nature and cause of the accusation against him. LSA-Const. Art. 1, § 13. The bill must contain all elements of the offense in sufficient particularity to enable the defendant to prepare for trial, to allow the court to determine the propriety of the evidence submitted at trial, to impose the correct punishment on a verdict of guilty, and to protect the defendant from subsequent prosecution for the same offense. State v. Comeaux, 408 So.2d 1099 (La. 1981).
If the bill fails to set forth the essential elements of the offense charged, but sets forth an identifiable offense against the laws of this state and informs the defendant of the statutory basis of the offense, the bill's constitutional deficiencies may be cured by the state's answers to the defendant's motion for a bill of particulars. State v. Gainey, 376 So.2d 1240 (La.1979).
The technical sufficiency of the bill of information may not be questioned after conviction where the accused has been fairly informed of the charge against him by the bill, has not been prejudiced by surprise or lack of notice, has not raised an objection to the bill prior to the verdict, and is protected against further prosecution by examination of the pleadings and the evidence on the present conviction. State v. James, 305 So.2d 514 (La.1974).
The only essential element of the molestation offense that was not included in the bill of information was the defendant's age. The bill gives the child's date of birth, alleges that the defendant is more than two years older than the child, and identifies the statute allegedly violated. Shelton first objected to the omission of his age in a motion in arrest of judgment, and has not shown any surprise or prejudice resulting from the omission. The motion in arrest of judgment was properly denied. See State v. Holstead, supra.
Moreover, Shelton testified at the trial that he was 30 years old and was 29 in March 1987, when the offense allegedly occurred.
Because the bill charged that Shelton engaged in the sexual conduct "by the use of duress, menace, psychological intimidation or use of influence by virtue of [his] position of control or supervision over the juvenile," Shelton argues he did not know which method the state intended to prove and was not able to properly prepare for trial. Shelton did not seek a bill of particulars to clarify the charge, but first raised this objection in a "motion to quash and/or supplemental motion in arrest of judgment."
*1292 The post-trial motions were not filed by the same lawyer who defended the case before and during trial. The record does not support Shelton's contention that he was confused by the bill of information and unable to prepare a defense.
Shelton and his trial counsel attended a preliminary examination on February 2, 1988. According to a defense motion to continue the trial, "Five witnesses testified at the preliminary hearing, which testimony was quite extensive." The trial was continued from March 28 until April 11 to give Shelton more time to obtain a transcript of the preliminary examination and to interview witnesses.
This record does not contain that transcript, nor the transcript of the state's opening statement at trial. The trial testimony clearly shows, however, that the state relied solely on Shelton's position of control or supervision over the child, his stepdaughter, as the method by which he committed the offense.
At the end of the state's case in chief, Shelton moved for a judgment of acquittal, contending the state had not proved three essential elements of the offense: his age, that any touching of the child by Shelton was done with the intention of arousing or gratifying his sexual desires, and that Shelton was in a position of control or supervision over the child. This defense motion challenging the sufficiency of the state's proof of control or supervision does not show, as Shelton now argues, that there was any confusion about the basis of the charge.
The state offered no evidence of duress, menace or psychological intimidation, as alleged in the bill of information. This record therefore protects Shelton against successive prosecution for the same offense. He has not shown that he was in fact surprised or prejudiced in preparing a defense by the wording of the bill. His post-trial complaints about the bill's deficiencies do not warrant reversal of the conviction. State v. James, supra; State v. Defraites, 449 So.2d 540 (La.App. 4th Cir. 1984), writ denied. See and compare State v. Panepinto, 542 So.2d 1073 (La.1989).

VIDEOTAPE
The child's videotaped statement was recorded at the Ouachita Parish Courthouse on April 20, 1987. Shelton was formally charged with molestation in November 1987. Shelton's January 1988 motion for discovery was answered by the state on February 19, 1988. On the morning of trial, April 11, 1988, the state filed a supplemental discovery response, indicating it "may introduce a videotape of an interview conducted by Law Enforcement with the child victim." At the same time, the state filed a motion in limine asking the court to rule on the admissibility of the videotape, governed by LRS 15:440.5, before the trial began.
When the state's motion was heard, the prosecutor was initially equivocal about whether or not the tape would be used during trial. After the prosecutor decided that the state would offer the tape, the court asked these questions of defense counsel:
COURT: Mr. Jefferson, by the way, have you seen the videotape?
COUNSEL: Yes, sir.
COURT: Do you feel it does not meet the requirements of 15:440.5 in some respect?
COUNSEL: Judge, I've read this statute before, I just ... it was my understanding that the District Attorney's Office was not going to use the videotape until this morning, and I had just started reading these eight requirements of 440.5 and I haven't read them all, and I am not prepared to say, at this point, until I read these admissibility requirements.
COURT: Let me read them, too ... let's both read them then. You read them and I will read them, too.
After the reading was accomplished, defense counsel objected to the videotape only on two grounds: that the questioning was leading, and that the tape violated Shelton's right to cross-examine the witness.
*1293 One of the statutory admissibility requirements is that the videotaped statement "was not made in response to questioning calculated to lead the child to make a particular statement." § 440.5 A(4). After viewing the tape, the court found that this requirement was satisfied.
Another admissibility requirement is that the child be "available" to testify at trial. § 440.5 A(8). The court found that the objection based on lack of cross-examination would be valid only if the child was not available to testify at trial. The child testified at trial and was cross-examined. The deputy sheriff who conducted the videotaped interview and the DHHR caseworker who was present during the interview also testified at trial and were cross-examined.[3]
Shelton now contends he was unable to effectively confront and cross-examine these witnesses because of the trial court's decision "to move forward despite the defense attorney's surprise and lack of preparedness" concerning the videotape. He argues the trial should have been continued, or the tape should not have been admitted, because its use was a "surprising, unanticipated major development in the conduct of the case created at the last moment by the State's dilatory response to discovery."
Although defense counsel stated it was his understanding that the state was not going to use the videotape at trial, he acknowledged that he had seen the tape and he was granted the time he requested to review the statutory admissibility requirements. Beyond that point, Shelton did not object to the videotape on the grounds of surprise or lack of preparedness to question the witnesses involved with the tape. He did not ask for a continuance or for other sanctions that may be imposed when the state does not promptly supplement discovery responses. C.Cr.P. Art. 729.5.
His contentions that the trial court should have continued the trial or denied admission of the videotape into evidence because of the state's late discovery response cannot be raised for the first time on appeal. C.Cr.P. Art. 841.
Even if the objections had been properly preserved, Shelton has shown no prejudice resulting from the admission of the videotape. The state's failure to comply with discovery requests does not constitute reversible error unless it causes actual prejudice to the defendant. State v. Busby, 464 So.2d 262 (La.1985).
Here, as in Busby, the state's supplementing of its discovery responses on the morning of trial informing defendant of its intention to introduce certain evidence was not shown to be prejudicial because the evidence was merely cumulative.
The state's initial discovery response, filed almost two months before trial, included Dr. O'Boyle's report of her examination of the child and the child's statements to her about what had happened. The child was one of the five witnesses who testified at the preliminary examination. She was cross-examined when she testified at the trial. She gave essentially the same account of what had happened as she gave in the videotaped statement, that is, that Jim hurt her vagina with his finger or with his hands.
On this record, we cannot say that the admission of the videotape deprived Shelton of his right to effectively confront and cross-examine the witnesses involved with the videotape.

SUFFICIENCY OF THE EVIDENCE
Shelton contends the trial court erred in denying his motion for judgment of acquittal because the state did not prove his age *1294 or that he was in a position of control or supervision over the child.
A motion for judgment of acquittal, available only in a bench trial, may be made at the close of the state's evidence, or of all the evidence, and shall be granted if the evidence is insufficient to sustain a conviction. C.Cr.P. Art. 778. The trial court's ruling on the motion is not reversed on appeal unless there is no evidence of the crime or an essential element thereof, or unless the denial is a palpable abuse of discretion. State v. Little, 353 So.2d 255 (La.1977).
In reviewing the denial of a motion for judgment of acquittal made at the close of the state's case in chief, we consider not only the evidence before the court when the motion was made, but the entire admissible evidence in the trial record. State v. Smith, 332 So.2d 773 (La.1976); State v. Hicks, 376 So.2d 118 (La.1979).
Notwithstanding the lack of direct evidence by the state that Shelton was over age 17 at the time of the offense, that fact can be inferred from the evidence that Shelton was married to the child's mother, combined with his physical appearance before the trier of fact, and the fact that he was being tried as an adult rather than a juvenile. See State v. Zihlavsky, 505 So.2d 761 (La.App. 2d Cir.1987), writ denied.
State v. Trull, 382 So.2d 960 (La.1980), cited by Shelton, is distinguishable. Trull's conviction for selling liquor to a minor was reversed because the state failed to prove Trull was over age 17 (LRS 14:91). The state's only evidence of her age came from a police officer whose testimony was ruled inadmissible based on a defense objection that the officer had no personal knowledge of Trull's age. Here, Shelton did not object to the child's stepmother's testimony that he was married to the child's mother. Although the court in Trull did not discuss the defendant's physical appearance before the trier of fact, we note that Trull, at age 19, was only two years over age 17, while Shelton here was 30 years old at the time of trial.
The state's evidence of Shelton's control or supervision over the child came primarily from the child's stepmother, who testified that the child lived for six months with her father and stepmother, and for six months with her mother and Shelton, her stepfather. The child called her mother by her first name, Rhonda, and testified that she was at Rhonda's house when Jim hurt her. She described Jim as the person "that lives with Rhonda."
The child's stepmother testified that she was initially reluctant to allow the child to visit her mother in March 1987 because the mother had only recently been released from a psychiatric hospital. The stepmother said she spoke to Shelton and he "told me that he would be there and, you know, not to worry." Shelton picked the child up from her father's house when the one-week visit began on March 14.
The trial court readily found sufficient evidence of Shelton's age but took a brief recess to consider the state's proof that he was in a position of control or supervision over the child. The court correctly stated that the issue at that juncture was whether the state had presented some evidence to prove that element of the offense. Finding that it had, the court denied the motion for judgment of acquittal.
The record supports the court's finding and does not show a palpable abuse of discretion in its ruling. State v. Little, supra. Even if we were to find the ruling erroneous when made, that is, at the close of the state's case in chief, the error would be cured by Shelton's evidence. State v. Smith, supra; State v. Ohrberg, 448 So.2d 1316, 1322 (La.App. 1st Cir.1984).
Shelton testified that he was 29 years old in March 1987. He admitted that he was present when the child visited in her mother's home. He testified that the child's mother was usually the one who supervised and disciplined her but admitted that he sometimes did so and that he "would probably correct her verbally when she did something wrong."
When asked if the child was under his care from time to time, Shelton replied, "She was at my house and I was there, if I *1295 was an adult I would hope I cared for [her]." He admitted that he had some control over her well-being and that he would not "let her run out in the street or anything like that." He often brought the child and her younger half brother to their nursery in the morning and picked them up in the afternoon.
A defense witness who had been in the mother's home when the child was there testified that she had seen Shelton correct the child and that it was apparent to her that Shelton had some control over the child, disciplined her, and acted in the capacity of a parent.
Shelton argues that the phrase "influence by virtue of a position of control or supervision" in LRS 14:81.2 was intended to apply only to persons to whom the parent entrusts the child for care, usually for a fee, such as babysitters, child care workers or teachers. Neither the express wording nor the purpose of the statute supports this argument. See LRS 14:3; State v. LeBlanc, supra. Compare factually State v. Brock, 521 So.2d 477 (La.App. 4th Cir. 1988), writ denied.
The evidence, viewed in a light that most favorably supports the verdict, allows a rational trier of fact to find proof of each essential element of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)

SENTENCE
At sentencing, Shelton was a 30-year-old first felony offender with a high school education and a good employment history. He and his estranged wife have a three-year-old son who is in the custody of Shelton's sister.
The sentencing court may, but is not required to, impose a suspended or probated sentence on a first felony offender under C.Cr.P. Art. 893. The court must select probation or imprisonment according to the facts of the case and the best interest of the public and the defendant. State v. McKethan, 459 So.2d 72 (La.App. 2d Cir. 1984).
The sentencing court noted that imprisonment would cause hardship to Shelton's son and to his parents, who relied on him for help after Shelton's father was diagnosed with cancer. The court weighed heavily in Shelton's favor the fact that he had no criminal record or history of sexual misconduct or child abuse.
Although defense counsel mentioned that a psychologist who had evaluated the child was of the opinion that she would suffer no long-term harm, the psychologist's report was not included or mentioned in the PSI report. The court emphasized that serious harm to the child "was at least threatened, and hopefully it was not caused."
In considering whether Shelton was likely to commit another crime, or was likely to respond affirmatively to probation, the court noted that he had never admitted, either during or since the trial, the conduct underlying the conviction, and had not sought treatment to prevent a recurrence.
Mr. Shelton, in order for probation to be successful you have to admit the problem, admit what took place, and if there's a full disclosure and so forth and you seek treatment then perhaps probation would be successful, but I'm not at all sure, from what I've seen of this case and you to this point, that probation would be the answer to this case.
The court sentenced Shelton to four years at hard labor. Shelton contends the sentence is excessive because the court failed to give proper weight to the mitigating factors it mentioned, and penalized him for having gone to trial and for maintaining his innocence.
A defendant's truthfulness or mendacity while testifying on his own behalf may be relevant to sentencing because it is probative of his attitude toward society and his prospect for rehabilitation, but must be assessed in light of all other pertinent sentencing factors and may not, standing alone, be used to enhance the sentence of a defendant whose testimony is deemed false. U.S. v. Grayson, 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978); State v. Taylor, 535 So.2d 1146 (La.App. 2d Cir. 1988).
*1296 The sentencing judge heard the trial testimony of Shelton, the child, and the pediatrician and family members to whom the child reported being hurt by Shelton. The record does not support Shelton's contention, made in the PSI report, that his estranged wife "has put his stepdaughter up to saying all of these things he has done."
The court properly considered Shelton's unwillingness to admit his criminal conduct as probative of his attitude toward society and his prospect for rehabilitation through probation. This was not the sole factor considered, however. The court expressly and thoroughly reviewed other Art. 894.1 factors and stated the factual basis for each finding in favor of or against probation. Compare State v. Smith, 407 So.2d 652 (La.1981), and State v. Soco, 441 So.2d 719 (La.1983). In those cases, the sentence was set aside because the court had considered only such factors as the defendant's credibility or his refusal of a plea bargain and had not considered or articulated mitigating factors under Art. 894.1.
The four-year sentence is less than one-third of the 15-year maximum under LRS 14:81.2 C. The court stated the sentence would have been much harsher if Shelton had a history of sexual misconduct or child abuse. This record does not show, as Shelton argues, that the court either failed to give the proper weight to the mitigating factors it recited, or relied on factors that should not have been considered in sentencing.

DECREE
The conviction and sentence are AFFIRMED.
NOTES
[1] Although the defendant in Cooper did not argue the point, we note that Act 74 of 1979 defined both first and second degree murder and provided that the former was punishable by death or life imprisonment and the latter by life imprisonment. While the two crimes were placed in separate sections of the Revised Statutes, they were dealt with in the same legislative act or bill.
[2] The intent of the legislature in enacting the molestation statute was to establish a more serious grade of offenses involving lewd acts with juveniles, punishable more severely than indecent behavior. State v. LeBlanc, 506 So.2d 1197 (La.1987).
[3] This court has found that a defendant's right to cross-examination is not violated by the use of a videotaped statement that complies with the admissibility requirements of LRS 15:440.5. State in Interest of R.C., Jr., 514 So.2d 759 (La. App. 2d Cir.1987), writ denied.

Since Shelton was not shielded from the child's view while she testified, he was not denied the right to face-to-face confrontation that has been recognized in cases where a screen is used during trial to insure that the child witness cannot see the defendant. LRS 15:283; State v. Murphy, 542 So.2d 1373 (La. 1989); Coy v. Iowa, ___ U.S. ___, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988).